# United States District Court
# District of Massachusetts

| | |
|---|---|
| JANE DOE, by and through her friend, KIM PIKE,<br>      Plaintiff,<br><br>    v.<br><br>BARBARA PIKE,<br>    Defendant/Third-Party Plaintiff,<br><br>    v.<br><br>KIM PIKE and BRIAN MCCORMICK,<br>    Third-Party Defendants. | CIVIL ACTION<br>No. 17-40021-TSH |

## MEMORANDUM Of DECISION AND ORDER
**December 6, 2019**

**HILLMAN, D.J.**

## Background

John Pike ("John") sexually assaulted his granddaughter, Jane Doe, multiple times between 2007 and 2010. Jane Doe sued John for those assaults in this Court. Default judgment was entered against John and Jane Doe was awarded damages. Jane Doe, by and through her mother and next friend, Kim Pike ("Kim" or "Plaintiff") now brings claims for negligent supervision (Count I) and negligent infliction of emotional distress (Count II) against her grandmother, Barbara Pike ("Barbara" or "Defendant"). The gravamen of Plaintiff's claims is that Barbara either was, or should have been, aware of John's abusive behavior, and should have taken steps to prevent it.

Barbara has filed a Third-Party Complaint against Kim and Brian McCormick ("Brian"), Jane Doe's parents, alleging claims for contribution.

This Memorandum of Decision and Order addresses the Motion for Summary Judgment By The Defendant/Third Party Plaintiff Barbara Pike (Docket No. 56). For the reasons set forth below, that motion is *denied*.

## Discussion

### Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a

genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted).  The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.* (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."'" *Id.* (citation to quoted case omitted).

Facts

*Parties and Pike Family Background*

Barbara was born in 1939 and is currently 80 years old. Barbara and John were married in 1956 and  have 5 children, Kim, John Gordon Pike ("J. Gordon "), Alan Pike ("Alan"), Scott Pike ("Scott"), and Joshua Pike ("Josh Pike"). Josh Pike was adopted by Barbara and John when his parents (John's brother and sister-in-law) died in a motor vehicle accident.

In or around 1969, Barbara, John and their children  moved from Virginia to Colchester, VT. At that time, the children ranged in age from 6 to 12. John disciplined his children at times with a belt. He struck his sons with open hands and closed fists and would kick at least one son if he attempted to protect himself. On two occasions while Kim was in high school, John physically restrained her. Additionally, John was emotionally abusive to Barbara during their marriage.

John played the "tickle game" with his children when they were young.  John described the tickle game as follows: "Well, what I would do is I would lay on the floor on my back, and they would lay in my crotch with their arms underneath my legs. And then I would ask them questions. If they answered the question right, do nothing. If they answered it incorrectly, then I would tickle them to make them giggle."  Kim similarly described the tickle game that she experienced as a child with her father: "[w]e would be pinned down and between his legs. My

mother did it too. It was fun. We all laughed. But they would ask questions an if you didn't have the answer to the question, you would be tickled mercilessly. You would just be tickled, you know, sometimes to where - - and that's why I asked, sometimes to where it hurt. You know, you were laughing so hard that you were almost in pain, you know, crying or upset. … it was fun." However, Kim also testified that the tickle game made her feel "discomfort", that she believed it was a "punishment" and that she believed John's intent was to "inflict pain."

J. Gordon similarly described the tickle game, testifying: "[H]e would — you know, you'd lay on the floor He'd have his legs over your arms. And he would ask you questions. and if you got the wrong answer then he would tickle you. and then he'd ask another question. But he seemed to never stop, I mean, literally." Scott similarly described the tickle game, testifying: "Basically just you'd – you'd sit down; he'd have his legs over your arms; he'd ask you questions. If you got it wrong, he'd tickle you." Scott further testified that his mother expressed concern
that the game was "abuse . . . because I was laughing so hard I couldn't get up." She would say "it was wrong to tickle someone like that." Barbara observed John play the tickle game with their children.

### *The Pike Grandchildren and their Relationship with John*

Barbara and John have 9 grandchildren: Hunter, Jane Doe, Seth, Ashley, Brittney, Jamie, Beau, Nina and Sally Doe. Hunter and Jane Doe are the daughters of Kim and Brian. They babysat for J. Gordon's children, Seth and Ashley. J. Gordon did not have any concerns about leaving his children with them. J. Gordon never observed any conduct between his children and John that concerned him. He observed John play the tickle game with Seth and Ashley at his home in Vermont. When he was observing John play the tickle game with Seth and Ashley, J. Gordon did

not think that there was a sexual component to that game. Ashley described the tickle game: "So it basically involved a guessing of for example, like what color t-shirt is my brother wearing if he wasn't in the room, and if I got it wrong, then they would tickle me. that was to the extent of it…. Usually it was on the floor and, again, this is just from memory. I usually remember myself laying on the ground and my arms were just pinned underneath his legs." Ashley thought the tickle game was fun and harmless. Kim observed John play the tickle game with Ashley and Seth. Prior to Jane Doe's disclosure in January 2014, J. Gordon never spoke with his siblings regarding any concerns about John.

Brittany, Jamie, Boaz and Nina are the children of Alan. John played the tickle game with Alan's children, Boaz and Nina. Alan observed his father John play the tickle game with his children at his home in Vermont. When he was observing his father, John, play the tickle game with Boaz and Nina, Alan did not think the tickle game was appropriate.

Scott and his wife Colleen Pike ("Colleen") have one child, Sally Doe. Colleen observed John playing tickle game with Sally Doe and never observed John interact with her in a manner that was concerning or inappropriate. Scott did not observe any inappropriate behavior between John and Sally Doe. Prior to Jane Doe's disclosure, Scott did not have any concerns about leaving Sally Doe alone with John.

*Jane Doe's Family Background and Pre-Disclosure Relationship With John*

Kim's daughter Hunter was born in 1994. Jane Doe was born in 2000. Jane Doe was adopted by Kim and Brian in May 2001. When Jane Doe was adopted, Kim, Brian, Hunter and Jane Doe lived in Hopedale, MA. In May 2001, Kim believed that she had a good relationship with her father. Kim and Brian wanted John around their home. John and Barbara moved to Bullhead City, AZ in or around 2001. In or around 2008, Brian and Kim lent John and Barbara

5

$98,000 to buy a condominium in Laconia, NH (the "Laconia condominium") so they could be close to the family. John and Barbara always made arrangements before visiting Brian and Kim. On numerous occasions, throughout Jane Doe's childhood, Kim asked Barbara to supervise and care for Jane Doe in her absence. Barbara was often accompanied by John, but Kim specifically asked Barbara and not John to supervise and care for Jane Doe. Barbara understood that she, rather than John, was responsible for the supervision and care of Jane Doe.

Kim and her family lived in Hopedale until 2006 and John and Barbara frequently visited them. Kim invited them to stay in Hopedale. John played the tickle game with Kim's children, Hunter and Jane Doe in Hopedale. Kim observed her father John play the tickle game with Hunter in Hopedale (it was "the same game" that John had played with her when she was a child.) Hunter described the tickle game as follows: "It was with John and we would be on the ground, lying down on the ground and locked under his legs, and he had to ask us questions and if we got them wrong he would tickle us."

Kim never told her father, John that he was not permitted to play the tickle game with her children, but she would tell him to stop when she saw her daughter getting upset. Kim's husband, Brian observed John play the tickle game with Hunter and Jane Doe. At no point in time while living in Hopedale was Brian concerned about John's interactions and conduct with Hunter and Jane Doe. In Hopedale, Brian observed John sitting on couch with Hunter and Jane Doe. In 2006, Kim, Brian, Hunter and Jane Doe moved from Hopedale to Upton, MA where they resided until 2009. John and Barbara would visit Kim and Brian while they lived in Upton six or seven times a year. While living in Upton, Jane Doe was between 6 and 9 years old. On occasion Kim would go out with Barbara and leave John home with Hunter and Jane Doe. Eventually, Hunter started going out with Kim and Barbara and on these occasions, Jane Doe was left home alone

with John. Hunter remembers that this happened on at least 10 occasions while they lived in Upton.

John and sat Hunter would watch television together during the period 1999-2006, and Hunter observed John sitting on the couch with Jane Doe watching television in their homes in Hopedale and Upton during this time. Hunter would sit on John's lap. John did not touch Hunter inappropriately, nor did Hunter observe John act inappropriately with Jane Doe in Upton. Hunter remembers that John, Barbara, Hunter, and Jane Doe occasionally used a blanket over their laps while sitting on the couch watching television in Hopedale and Upton. Prior to 2007-2008, including the time they lived in Hopedale, there is no allegation that any sexual abuse was committed by John against Jane Doe.

Kim and Brian purchased the cottage in Centerville, MA in February 2009. Kim moved to Centerville, MA in July 2009 after obtaining new employment as Principal of the Provincetown public schools. Jane Doe visited Kim in Centerville when she first moved there and then joined her in August 2009. Brian and Hunter moved to Natick for a time in 2009 and 2010 while Hunter attended boarding school. Hunter continued to go shopping with Kim and Barbara after Kim moved to Centerville in 2009, leaving Jane Doe behind with John. Kim and Brian moved to Yarmouth Port, Massachusetts in 2010.

Before the abuse occurred, Jane Doe would sit on the couch in the living room next to John with other people present. Brian observed John siting on the couch with some of his grandchildren, which did not strike him as unusual and it did not concern him. Brian observed John sitting on couch with his children with blanket on them. Alan did not observe anything of concern when he observed John interact with Jane Doe. Brian observed John continue to play the tickle game with Jane Doe in Upton during the 2006-2009 time period. Brian was not concerned

about John playing the tickle game with Jane Doe in Upton because it was "something that I'd seen for a number of years, and there was no ill effects. The children seemed to like it." At no point in time through October 2009 was Brian concerned about any interaction he observed of John with his children, nephews or nieces. Brian observed John sitting on couch in Centerville with Jane Doe. Brian and Kim had no concerns about John conduct with Hunter and Jane Doe at any point in time prior to move to Yarmouth Port in April 2010. At no time prior to Jane Doe's disclosure was Brian concerned with John's conduct with Jane Doe. Prior to Jane Doe's disclosure, Brian thought that John was a good grandfather to Jane Doe and Hunter and to his other grandchildren. Brian trusted John with Jane Doe.

Jane Doe was affectionate with John in the presence of others prior to the abuse. John tickled Jane Doe in the presence of her parents. John also played the "turn on the radio game" with Jane Doe, where he would twist Jane Doe's nipples outside of her shirt while saying he was "turning on the radio." Barbara observed John play the "turn on the radio" game with a grandchild but was not sure if it was with Jane Doe.

### *Sexual Abuse of Jane Doe Committed by John*

John sexually abused Jane Doe in Upton on multiple occasions. John sexually abused Jane Doe at the Centerville cottage on two occasions. On the first occasion, Hunter was the only other person in the home. The second occasion occurred in October 2009 when Jane Doe was in 4th grade. Jane Doe's teacher invited John and Barbara to Jane Doe's classroom to read a book entitled "The Cactus Hotel." John and Barbara took Jane Doe home from school after the reading. At some time after returning to the Centerville cottage, John sexually abused Jane Doe in her bedroom. Jane Doe does not know if Barbara was at the Centerville cottage when the abuse occurred and does

not remember anyone else being there. However, according to Barbara, she was present in the home.

John sexually abused Jane Doe at the Laconia condominium on at least one occasion. Jane Doe and Kim had traveled to Laconia to visit John and Barbara. Jane Doe does not remember how old she was, what year the abuse took place, or where she was living at the time. John touched Jane Doe over her clothing while sitting in his lap in the living room in the Laconia condominium. Barbara was in the dining room and John and Jane Doe were facing away from her when the abuse occurred. While abusing Jane Doe, John whispered to her to "be quiet." Jane Doe does not know if Barbara was aware that John abusing her-- she believes that Barbara was playing a crossword puzzle at the dining room table when John was touching her.

As part of the abuse, John performed oral sex on Jane Doe up to six times. Additionally, John made Jane Doe play the "penny game" in which he hid a penny under the foreskin of his penis and made Jane Doe find the penny and touch his penis. John told the Bullhead City Police Department that he played the hide-the-penny "half a dozen times", and that it "could have happened more than six times." John also. touched Jane Doe's breasts.  On one occasion, John's sexual abuse physically hurt Jane Doe.

### *Jane Doe's Disclosure of the Sexual Abuse Committed by John.*

Jane Doe disclosed John's sexual abuse of her to Kim in January 2014.  Kim was asked to write a report by Children's Cove a Child Advocacy Center ("Children's Cove"), located in Barnstable, MA and the Barnstable Police Department documenting what had happened to Jane Doe.  Kim's report was based on conversations that Kim had with Jane Doe between January 17 and January 29 regarding the sexual abuse committed by John.

Kim's report reflects that she asked Jane Doe "was anyone there when it happened?" Kim's report reflects that she asked Jane Doe where Kim was when the abuse happened and Jane Doe responded that Kim was at work or shopping with Barbara. Kim's report reflects that she asked Jane Doe where Brian was when the abuse happened, and Jane Doe responded that Brian was at work. Jane Doe told Kim that Hunter was upstairs on one occasion when she was abused by John in Centerville.

Jane Doe was interviewed at Children's Cove on January 30, 2014 by Lenny Fontes, the Assistant Director. In response to questions from Mr. Fontes, Jane Doe stated that no one was present when she was sexually abused by John, other than on one occasion, when her older sister Hunter, was upstairs at their home in Upton. In April 2018, Jane Doe testified that on one occasion when she was being abused by John underneath a blanket on a couch in Upton, Barbara was in the house and walked into the room when the abuse was happening and made eye contact with her. In April 2018, Jane Doe also testified that on another occasion she was abused in the Laconia condominium. Jane Doe does not remember when this incident occurred. John told Jane Doe not to tell anyone about the sexual abuse he was committing against her. No sexual abuse occurred after Jane Doe moved to Yarmouth Port in April 2010. Following Jane Doe's disclosure, John was arrested, and in October 2014, pled guilty to multiple counts of indecent assault on a child under 14, and was sentenced to 5 years' probation. John's probation has been supervised by the Mohave County Probation department in Mohave, AZ.

For a period after John's arrest for abusing Jane Doe, Barbara and John stayed at their son's home in Vermont, where Sally Doe, their young granddaughter was present. The Vermont authorities required them to leave the home. Subsequent to Jane Doe's disclosure and his arrest,

John admitted to his probation officer that he had touched Sally Doe on one occasion. John admitted that he touched Sally Doe between her buttocks at some unknown time in an unknown location. John also ran his hand over the underwear of Sally Doe at an unknown location on an unknown date prior to January 30, 2014. When asked whether he told anyone about the abuse of Jane Doe, John stated, "no, absolutely not." John did what he could to perform the abuse when no one else would know about it. He stated that when he was going to abuse Jane Doe, he made efforts to do it when no one else was around.

*Reaction to Jane Doe's Disclosure: Knowledge of John's Abusive Behavior*

Kim, Brian and the rest of the family were shocked to learn that John had sexually abused Jane Doe. Scott's "initial knee-jerk reaction" was that he didn't believe it—it was untrue. Colleen also could not believe that John could sexually molest Jane Doe. John's admission to the allegations "shook the hell out of" Scott. Hunter learned about John's abuse of Jane Doe and "didn't really understand how it could have happened. [She] was confused."

Alan and his wife, Lisa ("Lisa"), explicitly told Barbara not to leave their daughter alone with John because he was "untrustworthy." Alan was concerned that John would physically harm his daughter because he was "capable of doing harm to a child. . . of asserting dominance over somebody he feels is . . . weaker than him." Lisa observed that John had "this way that he interacted with the kids and played with them that was – that made me really uncomfortable. The way he would, like, squeal and act like a kid and get too rough. You know, he would tickle them to the point of pain and not stop. I just felt like the was – there was something physically and emotionally inappropriate about his interactions with the kids, and it made me feel uncomfortable." Lisa observed that John was "overly physical with them in a way that struck [her] as, not paternal. It felt – and not careful and just off." She further observed that John's

11

interaction with children had a sexual component and that his conduct was "gross" and lacked "boundaries."  She also felt that "[John Pike] is not a person you leave children with, and there's a million reasons why this is not a person you leave children with."  Lisa noted that "[John Pike] threatened to kill himself regularly, all the time. He threatened to kill other people. He had completely inappropriate reactions to all different sorts of social interactions and problems. [H]e was cruel. He got joy from other people's pain particularly children, his own.  She believes Barbara knew that he abused his sisters and that he was sexually abused."

Barbara has testified that she had no knowledge that John had touched Jane Doe in a sexually inappropriate manner until John admitted to touching Jane Doe after Jane Doe disclosed the abuse in January 2014. Barbara states that she was shocked to learn that John had sexually abused Jane Doe. Barbara also told Alan that she was disgusted by what John did.  Barbara acknowledged that she had observed John playing "turn on the radio" where he would touch their granddaughters' nipples. She thought the game was inappropriate. Barbara observed John repeatedly play a tickle game with his children in which he would hold a child down and trap him/her. John would ask the child questions and if the child answered incorrectly, he would tickle him/her. Barbara was concerned by the "tickle" game because she thought it was "mean."  Barbara witnessed John tickle and punch their grandchildren and hold their arms behind their back. She objected to this behavior because John would "take it too far" and she feared he was hurting the children. She observed other instances of abuse with their own children. For example, while parked near the Potomac river with Barbara and their young children in the car, John threatened to drive the car into the river, frightening the children to such an extent that they screamed in terror. She objected to this behavior. Barbara had also witnessed John physically abuse their children.  John beat his children with a belt, with his fists and with his open hand. Barbara characterized her

husband as "emotionally abusive" and believes he is mentally ill. According to Barbara, John would take a "small issue" and "blow it up."

John threatened to commit suicide at least ten times and took a gun out on several occasions in connection with his threats of suicide. On or about 1998, J. Gordon and his wife Pat ("Pat") alleged that John had sexually abused their daughter (John's granddaughter) Ashley. Pat understood that while at a soccer tournament in Montreal, John had been "walking around in his underwear" in Ashley's presence and that he had "touched" Ashley inappropriately. At the time, Barbara and John were staying in an RV park in Vermont. Barbara arrived at the RV park to find John parked on a side street in his truck. John explained to Barbara that Pat had accused him of inappropriate sexual behavior with Ashley and that he feared going home to their RV because there was a police car parked nearby and "he thought the police might be coming to get him." In response to the allegation, John "[took] a gun" and threatened suicide. Around the same time, John threatened to kill Pat. Kim only learned that John had been accused of sexually abusing Ashley in 2014, after Jane Doe disclosed the abuse she had suffered. Although Barbara knew that John had been accused of child sex abuse in the 1990s, she never shared that information with Kim.

Initially, Brian did not believe that Barbara knew or should have known that John was abusing Jane Doe. Brian submitted a victim impact statement at John's sentencing which stated in part:

• Having known John for over a quarter of a century, the depth of his betrayal and the stealth and cunning of his vile predation of my daughter was worthy of prison time.

• [John] used his [military] training to co-ordinate his opportunity to abuse [Jane Doe] and timed it perfectly so he was able to perform his perversions and clean up his mess in plenty of time so no suspicions were aroused. His attacks were no accident. He planned them, carried them

out, and put things back in place, swore his victim to secrecy much like a military maneuver.

• In the 24 years as John's son-in-law, I embraced him as my "dad" not in name only, but in the spirit of what the name "dad" embodied. I trusted and loved him in all things family. Needless to say you don't think twice about leaving your 8-9 year old daughter in his care. The depth of his betrayal torments me…

Brian now believes that Barbara knew about abuse because she knew John better than anyone and because she cut off communication with the family.

Jane Doe submitted a victim impact statement at John's sentencing which stated in part:

• Until the day when Papa and I were alone, he began to play a game he called, Hide the Penny. Right away, I knew something was wrong and I wasn't having fun anymore… He made me promise not to tell anyone. He made it such a big deal because he knew it was wrong too. He said I'd get in BIG trouble. I thought he might hurt me or my family. (emphasis in original)

• I'm angry at Baba for choosing to stay with you even though she told me on the phone how sorry she was – how she would have shot you herself if she had known.

Kim submitted a victim impact statement at John's sentencing which stated in part:

• I love, trusted and believed in my father. I welcomed [my father] into our home, where he came and repeatedly, over a period of two and ½ years, committed atrocities against our little girl…

• He did this during the day when watching over our child, and then sat nicely at dinner with my mother and our family talking about the days events…

• [Jane Doe] was brought up to believe that "Papa" was the best, a good guy who loved children, all children and loved playing tickle games, getting close to his grandchildren physically and emotionally.

14

> • My husband and I welcomed my parents into our home – to be part of our family time and time again. We visited them in NH and Arizona and wherever they lived. … We were a family, a close family… or so I thought. And 6 years ago when my parents wanted to buy a condo in NH so that they could be a little closer to their families in MA and VT, we loaned them $98,000.
>
> • [John] is a master manipulator… I now see that he has manipulated my mother, my brothers and I, my children and others for a very long time.
>
> • I think about how …. long [Jane Doe] had to keep silent and pretend to be part of a loving family, with John as her grandfather, who would hug and kiss her in front of us, while privately molesting her.

Kim believes that Barbara knew or should have known about the abuse. When asked why she believes Barbara knew or should have known about John's abuse of Jane Doe, Kim stated that she "listened to my daughter, and I listened to her heart and her gut of what she thinks." Kim testified that the fact that Barbara decided to stay with John demonstrates that Barbara knew about the abuse of Jane Doe. She also testified that the fact that John was emotionally abusive of Barbara and his children demonstrates that Barbara knew about the abuse of Jane Doe.

After John's arrest, Alan offered Barbara a place to live. Kim also asked Barbara to move in with her family. Barbara declined Kim's invitation because she did not want to uproot her life in Arizona and move across the country. Barbara was also concerned that she would lose John's military pension and health care benefits. She decided to remain in Arizona and live with John. Both are in failing health. Barbara has leukemia and John has had cancer and multiple strokes. Barbara is John's primary caretaker. After Barbara declined her invitation to move in with her, Kim cut off all contact with Barbara. Kim issued an edict to her siblings that anyone who remained in contact with Barbara could no longer have a relationship with Kim or her family. Barbara is estranged from all her children except for Scott.

<u>Whether Summary Judgment is Warranted</u>

Barbara has filed a motion for summary judgment contending that she is entitled to judgment on Plaintiff's claims as a matter of law because she did not owe Jane Doe a duty of reasonable care and/or the criminal conduct committed by John was not reasonably foreseeable to her. Because on the facts of this case the two theories are interrelated, I will address them together.

The Plaintiff has alleged claims for negligent supervision and negligent infliction of emotional distress against her grandmother, Barbara, as the result of being sexually abused by her grandfather, Barbara's husband, John. In order to prevail on a claim of negligence, " 'a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage.' " *Lev v. Beverly Enters-Mass, Inc.*, 929 N.E.2d. 303, 309 (Mass. 2010)(citation to quoted case omitted). Where a defendant does not owe a duty of care to the plaintiff, there is no actionable negligence. The existence of a duty of care is a question of law for the Court. making it appropriate for summary judgement. *Id.*

Barbara asserts that under Massachusetts law, a person does not have a duty to control the conduct of a third person and prevent him from causing harm to another. She further asserts that the only possible exceptions to the rule which *could* apply in this case are that there is a special relationship between her and the victim, Jane Doe, or a special relationship between her and the tortfeasor, John. She then argues that if this Court were to find such a special relationship exists such that she had a duty to Jane Doe, Jane Doe's claim fails because she establishes that John's tortious conduct was foreseeable. For the following reasons, I find that Barbara's arguments miss the mark and therefore, her motion must be denied.

16

Plaintiff contends that a duty of care exists based on the "special relationship" that exists between she and her grandmother. While the Court has not found a Massachusetts' case on point, courts in other states have recognized claims for negligent supervision against a grandparent for not protecting the minor child from sexual abuse committed by his/her spouse. *See e.g., D.H. v. Whipple*, 103 N.E. 3d 119 (Ct. Ap. Ind. 2018); *O.L. v. R.L.*, 62 S.W.3d 469, 474 (Mo. Ct. App. 2001).

> In analyzing such cases,
>
> [a]n often misunderstood aspect of the doctrine of negligent supervision and which when ignored often leads to confusing analysis is that the 'duty to supervise runs not to an activity, but rather to an individual.' With regard to negligent supervision of a child, the gravamen of the cause is the supervisor's obligation and ability to control the child and not the supervisor's control over the instrumentality (whether human, mechanical or other) which causes the harm. In this sense, negligent supervision of a minor is the exact opposite of the doctrine of negligent supervision of an adult, which emphasizes the supervisor's (whether employer, entrustor, etc.) right and ability to control the activity of the wrongdoer rather than to control the injured victim. Recognition of this basic principle aids the understanding of cases involving injury to children as an alleged result of negligent supervision and how those cases apply to the facts.

*O.L.*, 62 S.W.3d at 474. The duty to supervise "requires a relationship between the one it is claimed should have been supervised and the claimed supervisor." *Id.* At 475. "Such relationships (those that impose a duty of care) may arise by operation of law (e.g. master-servant), by agreement, or may be imposed by law in particular fact circumstances. Each of these relationships involves the essential determination as a matter of policy that the claimed supervisor has some duty of care either to protect the one to be supervised from injury or to protect third persons from injuries caused by the one to be supervised." *Id.* In this case, taking the facts in the light most favorable to the Plaintiff, Kim and Brian placed Jane Doe in the custody of her grandparents, and in particular Barbara, to, for lack of a better term, "babysit" her

when they were unavailable. While watching Jane Doe, Barbara was her caretaker and "entered into a relationship with the child that brought with it the duty to supervise the child." *Id.* Put another way, a person in Barbara's position (caring for a minor child) could reasonably foresee that she would be expected to take affirmative action to protect Jane Doe and could anticipate harm to the child from the failure to do so. *Accord Id.* at 475–76 ("[t]he duty to protect a child entrusted to one's care from sexual abuse or other injury arises merely (from the entrustment of the child to grandmother"). On the summary judgment record, I find that Barbara owed Jane Doe a duty of care.[1] The Court will now address whether she breached that duty.

Under traditional tort principles, "'the consideration of breach of duty will involve an integrated assessment of the degree of the risk and severity of potential harm and the likelihood injury will occur absent reasonable precautions. [F]oreseeability is not to be measured by what is more probable than not but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct.'" *Doe v. Braco,* No. 976170B, 2002 WL 1923870, at *5 (Mass. Super. May 16, 2002)(quoting *OL*, 62 S.W. 3d at 476-77). Thus, the question becomes whether Barbara knew or reasonably should have foreseen the criminal acts which John perpetrated on Jane Doe. On this issue, there are genuine issues of material fact which must be decided by a jury. More specifically, as the Court's findings make clear, viewing the facts in the light most favorable to the Plaintiff, there is evidence that a reasonable person in Barbara's position would have or should have known that John was abusing Jane Doe, or that he might have been abusing Jane Doe ( that is, Jane Doe was

---

[1] The question of whether Barbara had a duty to Jane Doe is ultimately a question of law. However, in making a finding that she did, the Court has relied on factual assertions which are in dispute. Where the question of duty is a mixed question of law and fact, the issue becomes one for the factfinder. Therefore, I find that the question of whether Barbara owed Jane Doe a duty in this case is ultimately a question for the jury.

at serious risk of being abused by John). Such evidence includes Barbara's own observations of John's conduct toward Jane Doe and their other grandchildren, including observing him playing the radio game, engaging in the tickle game to excess, being in the vicinity when the abuse occurred and "locking eyes" with Jane Doe while she sat next to John on the couch and his hands were under the blanket hidden from view.  Moreover, there is evidence that Barbara knew that John had been accused of sexually assaulting Ashley prior his abusing Jane Doe, yet when Jane Doe was in her care, she left her alone with John. Additionally, she never shared the allegation with Kim or Brian.[2]

There are genuine issues of material fact which preclude the Court from finding, as a matter of law that, Barbara did not owe a duty to Jane Doe, and that she did not breach that duty. Accordingly, Barbara's motion for summary judgment is denied.

## Conclusion

The Motion for Summary Judgment By The Defendant/Third Party Plaintiff Barbara Pike (Docket No. 56) is ***denied***.[3]

> /s/ *Timothy S. Hillman*
> **TIMOTHY S. HILLMAN**
> **DISTRICT JUDGE**

---

[2] There is a dispute of fact as to when Barbara learned of the abuse of Sally Doe. However, even if she learned of the abuse prior to being told by John's probation officer in January 2015 (because John had told her what he had done to Sally Doe), it is not clear when she learned of it, *i.e.,* before or after the abuse of Jane Doe ended.

[3] Trial in this matter is currently scheduled to commence February 3, 2020. The Court intends to hold the parties to that date and therefore, they should manage their remining expert discovery accordingly.